IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PROFITEL GROUP, LLC, a Georgia
Limited Liability Company,

    Plaintiff,

      v.

    CIVIL ACTION FILE
    NO. 1:05-CV-1764-TWT

POLYONE CORPORATION, an Ohio
Corporation,

    Defendant.

OPINION AND ORDER

This is a breach of contract action. It is before the Court on the Plaintiff's

Motion for Partial Summary Judgment as to Plaintiff's Breach of Contract Claim

[Doc. 78], the Plaintiff's Motion for Summary Judgment as to Defendant's

Conditional Counterclaim [Doc. 79], the Defendant's Motion for Summary Judgment

[Doc. 82], and the Defendant's Motion for Partial Summary Judgment With Respect

to Liability as to Defendant's Counterclaim [Doc. 82]. For the reasons set forth

below, the Plaintiff's Motion for Partial Summary Judgment as to its breach of

contract claim is DENIED, and its Motion for Summary Judgment as to the

Defendant's counterclaim is GRANTED. The Defendant's Motion for Summary

Judgment is GRANTED, and its Motion for Partial Summary Judgment as to its counterclaim is DENIED.

## I. BACKGROUND

Plaintiff ProfiTel Group, LLC ("ProfiTel"), is a limited liability company organized under the laws of the state of Georgia.  It is in the business of auditing client telecommunications bills.  In July 2003, ProfiTel entered into a contingency fee agreement, referred to as the Consulting and Confidentiality Agreement ("Consulting Agreement"), with Defendant PolyOne Corporation ("PolyOne").  Pursuant to the Consulting Agreement, ProfiTel would audit certain PolyOne telecommunications bills, including bills for long distance and data services, and identify past billing errors and non-conformances.  In the event that billing errors or non-conformances were found, ProfiTel would file a claim to recover refunds or credits.  ProfiTel's compensation for its auditing services was to be 50% of any "monies and/or credits for past billing errors and non-conformance actually recovered" by ProfiTel on behalf of PolyOne.  (Def.'s Statement of Material Facts, Ex. A, § 2.1.)  ProfiTel alleges that it is due, but has not been paid, a fee under the Consulting Agreement based on credits PolyOne allegedly received from its telecommunications carrier.

After entering into the Consulting Agreement, PolyOne provided to ProfiTel a number of invoices from MCI, PolyOne's telecommunications carrier.  In August

2003, ProfiTel notified PolyOne that its initial review of the identified invoices revealed that MCI had been overcharging PolyOne for domestic frame relay service. Specifically, after reviewing the relevant contracts between PolyOne and MCI, ProfiTel believed that PolyOne was entitled to a tariff discount over and above the 29% discount it received on frame relay service. According to ProfiTel, the overcharges resulting from the alleged discount percentage discrepancy for the period of April 2001 to August 2003 totaled more than $1 million. In December 2003 and again in February 2004, ProfiTel provided PolyOne with draft claim letters, each of which detailed ProfiTel's audit findings and demanded that MCI credit PolyOne's account for the alleged overcharges. PolyOne forwarded the letters to MCI, but MCI denied the claim both times. Thereafter, in December 2004, PolyOne advised ProfiTel that it was abandoning the claim because it believed that MCI had correctly charged for the frame relay service.

Despite PolyOne's abandonment of the claim, ProfiTel alleges that PolyOne later used the audit findings as a negotiating tool with MCI. At some point during 2004, PolyOne became aware that it would not meet the minimum volume levels required by its contract with MCI. PolyOne began renegotiating its contract. In early 2005, PolyOne and MCI executed an amendment to their contract, the Second Amendment to the Global Services Agreement ("GSA"), whereby MCI reduced the

minimum volume requirements for years two and three of the contract and excused any penalties associated with underutilization by PolyOne for year one.   (Def.'s Statement of Material Facts, Ex. KK, ¶¶ 2-3.)  In exchange for these concessions, PolyOne's exclusivity requirement was increased from 90% to 95% and PolyOne agreed to the following release:

> Customer hereby releases, forever quitclaims, and discharges MCI, its parents, subsidiaries, affiliates, agents, representatives, assigns, transferees, officers, directors and employees from any and all claims, causes of action, suits, damages, demands, obligations, and liabilities of every kind and nature whatsoever arising out of any alleged or actual billing errors related to frame relay services provided by MCI to customer prior to December 31, 2004 (the "Released Claims").  This release and discharge from all claims and liabilities applies to matters now known and to all matters that may hereafter be discovered, if any, with respect to the Released Claims above.  After execution of this Amendment, Customer shall thereafter be barred from bringing any charge, complaint or other action against MCI relating to such matters.

(Id., ¶ 5.)  PolyOne asserts that MCI agreed to the utilization adjustments without discussion of any claim associated with frame relay charges, and that the release was included by MCI as an afterthought simply to memorialize the fact that PolyOne would not be pursuing the previously asserted claim.  ProfiTel contends, however, that PolyOne used ProfiTel's audit findings, and the release of any claim arising out of the findings, as the basis for securing approximately $3.15 million in underutilization concessions from MCI.

ProfiTel argues that the underutilization concessions constitute a recovered "credit" under the terms of the Consulting Agreement.  As such, ProfiTel alleges that PolyOne breached the Consulting Agreement by failing to pay a fee equaling 50% of the underutilization concessions.  ProfiTel also asserts claims for unjust enrichment, promissory estoppel, fraud, and attorney's fees under O.C.G.A. § 13-6-11.  ProfiTel moves for summary judgment on its breach of contract claim.  PolyOne moves for summary judgment on all of ProfiTel's claims.   In addition, PolyOne asserts a counterclaim, alleging that ProfiTel breached the Consulting Agreement.  ProfiTel moves for summary judgment on this claim, and PolyOne moves for summary judgment as to liability only.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  DISCUSSION

### A.      Breach of Contract

ProfiTel claims that PolyOne breached the Consulting Agreement by failing to pay to ProfiTel a fee for alleged credits received as a result of the audit findings. Pursuant to the Consulting Agreement choice of law provision, the contract is to be construed under and in accordance with Ohio law.  (Def.'s Statement of Material Facts, Ex. A.)  Under Ohio law, interpretation of a written contract, including whether terms are ambiguous, is a question of law.  Aerel v. PCC Airfoils, L.L.C., 371 F. Supp. 2d 933, 939 (N.D. Ohio 2005).  The intent of the parties to a contract must be determined from the contract language itself.  Medical Billing, Inc. v. Medical Mgmt. Scis., Inc., 212 F.3d 332, 337 (6th Cir. 2000); State ex rel. Petro v. R.J. Reynolds Tobacco Co., 820 N.E.2d 910, 915 (Ohio 2004).  A court may look to extrinsic evidence to ascertain the intended meaning only if the terms of the agreement are unclear or ambiguous.  Aerel, 371 F. Supp. 2d at 939; Petro, 820 N.E.2d at 915.  In interpreting contract language, words must be given their plain and ordinary meaning "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall content of the document."  Medical Billing, Inc., 212 F.3d at

337; <u>Petro</u>, 820 N.E.2d at 915.  Thus, contract terms are ambiguous only if the meaning of the terms cannot be determined from reading the entire contract or if the terms are susceptible of more than one reasonable interpretation.  <u>Waste Mgmt., Inc. v. Rice Danis Indus. Corp.</u>, 257 F. Supp. 2d 1076, 1083 (S.D. Ohio 2003); <u>Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC</u>, 740 N.E.2d 328, 339 (Ohio Ct. App. 2000).  If terms are ambiguous, extrinsic evidence appropriately considered by the court includes: (1) the circumstances surrounding the parties at the time the contract was made; (2) the objectives intended to be accomplished by entering into the contract; and (3) any acts that demonstrate the construction the parties intended to give the agreement.  <u>Crane Hollow, Inc.</u>, 740 N.E.2d at 339.

ProfiTel contends that it is entitled to recover a percentage of the value of the underutilization concessions provided to PolyOne by MCI.  Section 2.1 of the Consulting Agreement addresses ProfiTel's entitlement to compensation and provides, in pertinent part:

> [ProfiTel's] fee from "Audit Findings," as defined in Section 1.1 of this agreement[1], shall be 50% of all monies and/or credits for past billing errors and non-conformance actually recovered by [ProfiTel] on behalf of [PolyOne] . . . For an abundance of clarity, [ProfiTel] will receive a percentage only of recoveries for past billing errors and non-

---

[1]Section 1.1 of the Consulting Agreement defines "audit findings" as "[p]ast billing errors and non-conformance(s)" as identified from audits of PolyOne's long distance and data services bills.  (Def.'s Statement of Material Facts, Ex. A, § 1.1.)

conformances; [ProfiTel] will not receive a percentage of any recoveries
on future billings.

(Def.'s Statement of Material Facts, Ex. A, § 2.1.)  PolyOne contends that ProfiTel is

not entitled to a fee under this provision for a number of reasons, arguing first that

ProfiTel did not identify any actual "billing error" for which fee recovery was

warranted.  The parties do not argue that "billing error" is ambiguous and, therefore,

the phrase will be given its plain and ordinary meaning.  However, in addition to

maintaining that it did identify legitimate billing errors, ProfiTel contends that

PolyOne is equitably estopped from challenging the validity of the audit findings.

### 1.    Billing Errors

ProfiTel was entitled to receive a fee for money or credits obtained due to

billing errors or non-conformances in PolyOne's telecom bills.  In conducting the

audit, ProfiTel analyzed invoices that covered the following services provided to

PolyOne by MCI: (1) outbound and local; (2) toll-free; (3) access; (4) frame relay; and

(5) UUNET.  Although four of the five invoices were validated as correct, ProfiTel

stated that "the Frame Relay invoice had a significant billing error due to the

misapplication of discounts that was costing PolyOne in excess of $35K per month

. . . ."  (Def.'s Statement of Material Facts, Ex. M, at 2.)  ProfiTel based this

conclusion on its interpretation of a number of agreements between PolyOne and

MCI: the Special Customer Arrangement ("SCA"), the GSA, and the First

Amendment to the GSA ("First Amendment").  (Def.'s Statement of Material Facts,

Exs. N-P.)  By way of background, the original service agreement between PolyOne

and MCI was the SCA.  With regard to discounts for frame relay service, Section 5.7

of Attachment A of the SCA governed, providing in relevant part:

> Domestic MCI Hyperstream Frame Relay Service ("HFRS"): Subject to
> Customer's enrollment under an MCI accepted HFRS Enrollment Form
> and Agreement ("HFRS Agreement"), Customer shall be eligible to
> receive during the term of this Agreement, *in addition to any discounts*
> *authorized under the HFRS Agreement, a discount equal to nineteen*
> *percent (19%)* on all service elements eligible for discount under the
> terms of the HFRS Agreement.

(Def.'s Statement of Material Facts, Ex. N, § 5.7) (emphasis added).  On November

30, 1999, PolyOne and MCI executed the GSA, which incorporated the terms of the

SCA. (Def.'s Statement of Material Facts, Ex. P, § 2.2.)  Nothing in the GSA altered

or amended the frame relay discount provision set forth in Section 5.7 of Attachment

A of the SCA.  However, as part of the First Amendment, Section 5.7 was deleted and

replaced with the following:

> Interstate Frame Relay (Option 2) Service.   For MCI WorldCom
> interstate Frame Relay (Option 2) Service originating and terminating in
> the United States (excluding Metro Frame Relay Service), Customer *will*
> *pay the then standard rates, less a discount of 29%* . . . This discount
> does not apply against any other charges . . . .

(Def.'s Statement of Material Facts, Ex. O, ¶ 13) (emphasis added).

In its audit findings relating to the frame relay invoice, ProfiTel acknowledged that by replacing Section 5.7, "the contract no longer explicitly stated that PolyOne was entitled to the *additional discounts authorized under the HFRS Agreement*." (Def.'s Statement of Material Facts, Ex. M, at 3.)  Nevertheless, according to ProfiTel, the deletion of the additional discount language did not eliminate the tariff discount applicability and PolyOne remained entitled to that discount based on its frame relay volume and term commitments.  (Id. at 3.)  As such, ProfiTel identified as a billing error the fact that PolyOne received only a 29% discount, rather than a 54% discount, on frame relay from April 2001 through August 2003.  (Id. at 4.)  PolyOne contends that the alleged billing error resulted from an incorrect interpretation of the governing agreements.

To assess the validity of the audit findings and, thus, whether ProfiTel identified a billing error, the Court must necessarily construe the terms of the SCA, the GSA, and the First Amendment.  According to the choice of law provision, these agreements are to be governed by New York law.[2]  Under New York law, the court is to ascertain the intent of the parties based on the language of the contract itself. Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094

---

[2]Section 5.12 of the GSA incorporates by reference Section 8 of the SCA, which provides that New York law governs the agreement and any causes of action arising out of it.  (Def.'s Statement of Material Facts, Exs. N, P.)

(2d Cir. 1993); see also Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 69 (2d Cir. 2005) (applying New York law) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . The best evidence of what parties to a written agreement intend is what they say in their writing."). "If a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger, 423 F.3d 145, 149 (2d Cir. 2005). Ambiguity is a question of law which the court determines based on the contract alone. Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006). Language is ambiguous if, viewing it objectively, more that one meaning may reasonably be ascribed to it. Id.; see Sayers, 7 F.3d at 1095 ("Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."). Unambiguous terms are those with "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."

Waldman, 423 F.3d at 149 (quoting Care Travel Co. v. Pan Am. World Airways, Inc.,

944 F.2d 983, 988 (2d Cir. 1991)); Sayers, 7 F.3d at 1095.  Terms that are deemed

unambiguous are generally accorded their ordinary meanings.  Id.

   Whether ProfiTel identified an actual billing error turns on what discount rate

PolyOne was entitled to receive on frame relay service.  Section 5.7 of Attachment A

of the SCA originally provided that PolyOne was entitled to a discount in addition to

the 19% discount expressly provided under the contract.  However, as discussed

above, the First Amendment set forth a new discount rate of 29% and eliminated the

additional discount language.  Despite that fact, ProfiTel contends that PolyOne

remained entitled to a tariff discount in addition to the stated 29% discount.  In

support of this construction, ProfiTel cites to Section 1 of the SCA, titled "Service

Provisioning," which states, in pertinent part:

> MCI will provide to Customer interstate and international
> telecommunications service(s) provided pursuant to MCI Tariff FCC No.
> 1, MCI Tariff FCC No. 8, WUI Tariff FCC No. 27, and any other
> interstate and international tariff of MCI and its U.S. affiliates, *each as
> supplemented by this Agreement . . . This Agreement incorporates by
> reference the terms of each such MCI tariff.*

(Def.'s Statement of Material Facts, Ex. N, § 1) (emphasis added).  ProfiTel appears

to argue that the italicized portion of Section 1 indicates that the incorporated MCI

tariffs, including any tariff discounts, supplement the provisions applicable to all

services covered by the SCA.  However, this introductory provision only addresses

tariff applicability in a general manner and does not specifically refer to discounts. Rather, a subsequent "Rates and Discounts" provision provides:

> The rates, discounts, terms and conditions of this Agreement are those set forth in applicable MCI Tariffs, except as set forth in Attachment A, which is hereby incorporated by reference.

(Id., § 2).  "It is a fundamental principle of contract interpretation that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."  In re Chateaugay Corp., 198 B.R. 848, 855 (S.D.N.Y. 1996) (citation omitted); see Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir. 2001) (applying New York law) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'") (quoting Restatement (Second) of Contracts § 203(c) (1981); see also Arthur Linton Corbin, Corbin on Contracts §§ 545-54, at 521 (1952) ("[W]ords of general description should generally yield to words that are more specific.").  This is true even where there is no "true conflict" between the two provisions.  Aramony, 254 F.3d at 413.  Accordingly, the language of the "Rates and Discounts" section controls the determination of what discounts apply to various services.

In arguing for the proper construction of Section 2, i.e., the "Rates and Discounts" section, PolyOne focuses on the clause providing that MCI tariff discounts control, "except as set forth in Attachment A."  (Def.'s Statement of Material Facts,

Ex. N, § 2.)   According to PolyOne, this phrase means, when given its plain and ordinary meaning, that tariff discounts are the default and apply unless a provision of Attachment A expressly addresses the applicable discount for a particular service.   As previously discussed, frame relay discounts are covered by Section 5.7 of Attachment A, as amended by the First Amendment.   Because Section 5.7 states only that a 29% discount will be applied to standard frame relay rates and  does not provide for any additional discount, PolyOne asserts that the express discount rate trumps and renders inapplicable any unreferenced tariff-based discount.

ProfiTel disagrees with PolyOne's construction, arguing that exclusion of tariff discounts may only be accomplished by using specific "in lieu of" language and that the "except as" language of Section 2 is not equivalent to "in lieu of."  According to ProfiTel, the absence of the requisite "in lieu of" language means that Section 5.7 inherently provides for application of the tariff discount in addition to the stated 29% discount.  ProfiTel points to several instances in Attachment A where the parties used the "in lieu of" language when discussing the applicability of stated rates and discounts to the exclusion of tariffs.  For example, Section 4.1.3, as amended, states: "In lieu of Tariffed rates, Customer will pay the following Postalized Rates . . . ."; and Section 4.1.5 states: "The Customer will be charged the following . . . rates for domestic network MCI Conferencing usage . . . in lieu of discounts and standard

tariffed rates." (Reply in Support of Pl.'s Mot. for Partial Summ. J., Ex. 13.) Based on these examples, ProfiTel claims that when MCI intended to eliminate tariffs completely for specific services, it did so with express "in lieu of" language. However, the use of the "in lieu of" language must be considered in the context of the provisions in which it appeared. Specifically, most of the sections cited by ProfiTel fall under Section 4.1 of Attachment A ("Postalized Rates"), which expressly references tariffs and states that "[t]he rates below will fluctuate with any changes in the Tariff . . . ." (Id.) In light of the fact that tariffs are the expressed starting point, it was more incumbent on the parties to exclude explicitly application of the tariffs from the rates addressed in the cited Section 4.1 subsections. ProfiTel also cites to Section 5.1.1, as amended, and Section 5.3.1. However, in each of these sections, as with the Section 4.1 subsections, the "in lieu of" of language is preceded by specific references to tariffs.[3] In contrast, Section 5 ("Volume Discounts"), under which the relevant Section 5.7 falls, states that the "Customer will be charged the rates and

---

[3]Section 5.1.1, as amended, provides: "Customer will pay standard Tariffed international outbound rates, less a 10% discount, which discount shall be in lieu of any otherwise applicable Tariffed discounts." (Pl.'s Reply, Ex. 13.) Section 5.3.1 states, in pertinent part: "In lieu of the APP discount identified in Section 5.3 above or any other rate or discount, Customer will pay . . . ." (Id.) The referenced Section 5.3 provides: "The Customer will receive the rates, charges and discounts associated with the Access Pricing Plan ("APP") set forth in the Tariff . . . ." (Id.)

receive the discounts set forth under this Agreement," without any mention of tariffs. (Id.)  As such, the same explicit "in lieu of" language was not necessary in Section 5.7 to eliminate application of the tariff.  Furthermore, although ProfiTel repeatedly states that specific "in lieu of" language is mandatory, it provides no statutory or case law support for its assertion.  Consequently, the Court cannot find that MCI was required to include this particular language in order to eliminate the application of tariff discounts in addition to the stated discount for frame relay service.

Viewing the contract as a whole, the Court finds no ambiguity regarding what discount percentage applies to frame relay service provided to PolyOne.  Rather, the Court finds that Section 2 of the SCA unambiguously provides that MCI tariffs generally govern rates and discounts.  However, as indicated by the "except as" clause, in the event that Attachment A addresses the discount applicable to a particular service, the specific terms of Attachment A control.  See Continental Ins. Co. v. Arkwright Mut. Ins. Co., 102 F.3d 30, 34 (1st Cir. 1996) ("except . . .for" language in insurance contract unambiguously excluded specified deductible rate when another deductible provision applied); see also Donovan v. Bankers Fid. Live Ins. Co., 26 F.3d 854, 855 (8th Cir. 1994) (applying Georgia law) ("except as specifically provided" language was clear and unambiguous).  Additionally, Section 5.7 of Attachment A unambiguously sets forth an exclusive discount rate for frame relay service.  There is

no mention of an additional discount, tariff or otherwise, and the Court will not insert or give effect to terms that were not expressed in the contract.  Neither the language of Section 2 nor Section 5.7 is reasonably susceptible to an interpretation other than that PolyOne was entitled to a 29% discount on standard frame relay rates.  It is undisputed that the frame relay invoice audited by ProfiTel indicated that PolyOne received a 29% discount.  Consequently, ProfiTel failed to uncover any legitimate billing error.

Even if Profitel had found a billing error, it has failed to show that PolyOne received monies or a credit for the error.  It is undisputed that no money was received by PolyOne.  Profitel argues that the concessions that PolyOne received on the minimum usage requirements was a "credit" for billing errors.  But it has not shown any connection between the two.  The illogic of ProfiTel's position is that the alleged billing errors that it identified – $1 million for which it would receive a fee of $500,000 – has now become a $3.15 million credit for which it should receive a fee of $1,575,000.  If MCI received anything in exchange for the release, it was not release of a  $3.15 million liability.  It appears that the release was just an "afterthought" as MCI and PolyOne were adjusting through negotiations a complicated contractual relationship, and  that it had nothing to do with a real dispute about the frame relay billings.

2.    Equitable Estoppel

ProfiTel contends that the doctrine of equitable estoppel bars PolyOne from arguing that there were no billing errors.  In order to establish equitable estoppel, as generally defined by Georgia law, ProfiTel must show that: (1) PolyOne misrepresented or concealed material facts; (2) PolyOne knew of the true facts; (3) ProfiTel did not know, nor should have known, the true facts; (4) PolyOne intended ProfiTel to act on the misrepresentation or had reason to believe that ProfiTel would rely upon it; and (5) ProfiTel reasonably and detrimentally relied upon the misrepresentation.  See Bowers v. Blue Cross Blue Shield of Ga., 16 F. Supp. 2d 1374, 1380 (N.D. Ga. 1998) (citing National Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc., 929 F.2d 1558, 1572 (11th Cir. 1991), abrogated on other grounds, Geissal v. Moore Med. Corp., 524 U.S. 74 (1998)); Kim v. Park, 277 Ga. App. 295, 296 (2006) (citing Hunnicutt v. Southern Farm Bureau Ins. Co., 256 Ga. 611, 613 (1987)).  ProfiTel does not allege any facts to satisfy the specific elements of equitable estoppel.  Rather, relying on DeShong v. Seaboard Coast Line Railroad Company, 737 F.2d 1520 (11th Cir. 1984), ProfiTel argues that PolyOne may not derive a benefit from ProfiTel's audit findings, i.e., the underutilization adjustments set forth in the Second Amendment to the GSA, and subsequently contest the validity of those findings to avoid paying ProfiTel a fee.  In DeShong, the plaintiff claimed to

be an employee of one company for purposes of recovering under Florida's

Workmen's Compensation Act, and then later asserted a claim under the Federal

Employers' Liability Act, claiming that he was an employee of another company.[4] Id.

at 1521.   In addressing whether that plaintiff was estopped from asserting those

allegedly inconsistent positions, the Eleventh Circuit Court of Appeals stated:

> Under the doctrine of equitable estoppel a party with full knowledge of
> the facts, who accepts the benefits of a transaction, contract, statute,
> regulation or order, may not subsequently take an inconsistent position
> to avoid the corresponding obligations or effects.   *Thus, a plaintiff*
> *should not be permitted to assert formally the existence of one state of*
> *facts in a claim against one party and accept benefits in satisfaction of*
> *that claim, and then maintain an action against another party on the*
> *ground that the facts first asserted did not exist.*

Id. at 1522 (emphasis added).   Therefore, it appears from the language employed by

the Eleventh Circuit that equitable estoppel will apply if a party formally asserts a

---

[4]Specifically, the plaintiff was employed as a truck driver for Seacoast
Transportation Company ("Seacoast").  After being injured while coupling his truck
to a trailer owned by the defendant company, the plaintiff received workmen's
compensation benefits from Seacoast, a wholly-owned subsidiary of the defendant.
The defendant argued that the plaintiff could not claim to be the employee of two
separate companies in order to recover under different statutes.  DeShong, 737 F.2d
at 1521.  The Eleventh Circuit determined that a plaintiff in a FELA action may
properly be found to be an employee of both a wholly-owned subsidiary of a railroad
and the railroad itself.  Thus, because "inconsistency is the crucial element of the
doctrine of estoppel," the court ultimately held that equitable estoppel was
inapplicable in that case.  Id. at 1523-24.

factual position as the basis for a legal claim only to allege inconsistent facts in a subsequent claim.

Application of the <u>DeShong</u> estoppel is fundamentally rooted in aiding the law in the administration of justice. <u>DeShong</u>, 737 F.3d at 1522. ProfiTel seeks to expand its scope far beyond that to create contract-like rights based upon allegedly inconsistent actions in transactions with other private parties. The Court is not inclined to go down that path.[5] In any event, PolyOne is not taking inconsistent positions. Releasing a claim and now saying that the claim was worthless are not inconsistent positions. Accordingly, PolyOne is permitted to challenge the validity of the audit findings to defend against ProfiTel's breach of contract claim.

B.    <u>Unjust Enrichment and Promissory Estoppel</u>

---

[5]ProfiTel also relies on <u>Teldata Control, Inc. v. County of Cook</u>, No. 02 C 7439, 2004 WL 2997644 (N.D. Ill. Dec. 28, 2004), to support its equitable estoppel argument. In that case, which similarly involved a plaintiff seeking to recover a percentage of the defendant's recovery from telecommunications billing audits, the Northern District of Illinois stated that "the Court does not see how the [defendant] can retroactively seek to deny [the plaintiff] commissions on credits already given based on purported defects in performance that the [defendant] never mentioned until long after the credits were secured." <u>Id.</u> at *4. In making that observation, the court made no mention of nor finding regarding equitable estoppel but, rather, was solely addressing whether the plaintiff had substantially performed under the contract. <u>Id.</u> at *4-*5. Thus, ProfiTel's reliance on <u>Teldata Control</u> is not persuasive.

In its Amended Answer, PolyOne asserted an affirmative defense in which it alleged that the Consulting Agreement was not a valid and enforceable contract because of a lack or failure of consideration.  (Am. Answer, Seventh Affirmative Defense.)  As a result, and in the event that the Court found the Consulting Agreement to be unenforceable, ProfiTel amended its Complaint to assert claims for unjust enrichment and promissory estoppel.  Indeed, unjust enrichment is available only when there is no legal contract.  Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1413 (11th Cir. 1998) (citing Regional Pacesetters, Inc. v. Halpern Enters. Inc., 165 Ga. App. 777, 782 (1983)); see also Smith Serv. Oil Co. v. Parker, 250 Ga. App. 270, 272 (2001) ("The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated.").  Similarly, where an enforceable contract contains the promises alleged in support of a promissory estoppel claim, promissory estoppel is not available as a remedy.  See Adkins v. Cagle Foods JV, LLC, 411 F.3d 1320, 1326 (11th Cir. 2005) (citing Bank of Dade v. Reeves, 257 Ga. 51 (1987)).  Although alleging in its Amended Answer that the Consulting Agreement lacked consideration and is therefore unenforceable, PolyOne now asserts that the agreement is indeed enforceable.  (Def.'s Mem. in Support of its Mot. for Summ. J. at 23.)  When neither side disputes the existence of a valid contract,

claims for unjust enrichment and promissory estoppel fail as a matter of law.  Thus,

PolyOne is entitled to summary judgment on both claims.[6]

      C.    <u>Fraud</u>

ProfiTel asserts a claim for fraud arising out of PolyOne's alleged breach of the

Consulting Agreement.  To establish a fraud claim, the plaintiff must prove: (1) a false

representation by the defendant; (2) scienter (knowledge that the representation was

false at the time made); (3) intent to induce the plaintiff to act or refrain from acting;

(4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff.  <u>Next Century</u>

<u>Commc'ns Corp. v. Ellis</u>, 318 F.3d 1023, 1027 (11th Cir. 2003); <u>Perimeter Realty v.</u>

<u>GAPI, Inc.</u>, 243 Ga. App. 584, 595 (2000).  "The general rule is that actionable fraud

cannot be predicated upon promises to perform some act in the future.  Nor does

actionable fraud result from a mere failure to perform promises made.  Otherwise any

breach of a contract would amount to fraud."  <u>Equifax, Inc. v. 1600 Peachtree, L.L.C.</u>,

---

[6]Perhaps in response to PolyOne's concession that the Consulting Agreement is enforceable, ProfiTel did not respond to PolyOne's arguments regarding its entitlement to summary judgment on these claims.  "When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."  <u>Brandon v. Lockheed Martin Aeronautical Sys.</u>, 393 F. Supp. 2d 1341, 1346 (N.D. Ga. 2005) (citations omitted); <u>see also</u> <u>Price v. Facility Mgmt. Group, Inc.</u>, 403 F. Supp. 2d 1246, 1253 (N.D. Ga. 2005) (plaintiff's ERISA claim deemed abandoned based on failure to respond to defendant's arguments); <u>Bute v. Schuller Int'l, Inc.</u>, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned.").

268 Ga. App. 186, 195 (2004) (quoting Beltz v. Atlanta Coachworks Corp., 172 Ga. App. 604, 605 (1984)); see also Next Century Commc'ns Corp., 318 F.3d at 1027. An exception to the general rule exists when the promise regarding the future event is made with the present intention not to perform.  Perimeter Realty, 243 Ga. App. at 595-96.  ProfiTel alleges that PolyOne entered into the Consulting Agreement with the present intention not to abide by its terms.  However, not only has ProfiTel failed to establish that the Consulting Agreement was breached, but it has further failed to present any evidence that PolyOne intended to breach the Consulting Agreement at the time the contract was entered into.  Thus, ProfiTel's fraud claim fails and PolyOne is entitled to summary judgment.

D.   Attorney's Fees

ProfiTel asserts a claim for attorney's fees under O.C.G.A. § 13-6-11.  Section 13-6-11 allows a plaintiff to recover the expenses of litigation when the defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."  Because ProfiTel has lost its breach of contract claim, its claim for attorney's fees fails as well.  United Cos. Lending Corp. v. Peacock, 267 Ga. 145, 147 (1996) ("A prerequisite to any award of attorney fees under O.C.G.A. § 13-6-11 is the award of damages or other relief on the underlying claim.").  Moreover, even if ProfiTel's underlying claim was successful, Georgia

courts have held that statutes allowing for the recovery of attorney's fees, including

Section 13-6-11, are substantive for purposes of Erie.  See Elberta Crate & Box Co.

v. Cox Automation Sys., LLC, No. 6:05 CV 03(HL), 2005 WL 1972599, at *5-*6

(M.D. Ga. 2005); Pinkerton & Laws, Inc. v. Royal Ins. Co. of Am., 227 F. Supp. 2d

1348, 1357 (N.D. Ga. 2002) (citing McMahan v. Toto, 256 F.3d 1120, 1132 (11th Cir.

2001); All Underwriters v. Weisberg, 222 F.3d 1309, 1311-12 (11th Cir. 2000)).

Consequently, under Georgia's choice of law rules, Section 13-6-11 is not applicable

if the laws of another state apply to the issues in this case.  Elberta Crate & Box Co.,

2005 WL 1972599, at *6; Pinkerton & Laws, Inc., 227 F. Supp. 2d at 1357.  Here, the

choice of law provision set forth in the Consulting Agreement specifies that Ohio

substantive law applies.  Because the attorney's fees claim arises out of ProfiTel's

breach of contract claim, the choice of law provision controls this claim as well.  See

Elberta Crate & Box Co., 2005 WL 1972599, at *6 (Section 13-6-11 inapplicable

where Illinois law applied pursuant to contract choice of law provision); see also Boyd

Rosene & Assocs., Inc. v. Kansas Mut. Gas Agency, 174 F.3d 1115, 1127-28 (10th

Cir. 1999) (choice of law provision controlled award of attorney's fees even though

contract did not expressly address the issue); Fairmont Supply Co. v. Hooks Indus.,

Inc., 177 S.W.3d 529, 535-36 (Tex. App. 2005) ("[T]he award of attorney's fees is

inextricably intertwined with the substantive issue of contractual liability--an issue

that is undisputably governed by the choice-of-law provision.").   Thus, O.C.G.A. §

13-6-11 is inapplicable, and summary judgment for PolyOne is proper.

      F.     <u>PolyOne's Counterclaim</u>

      PolyOne's breach of contract counterclaim arises out of the same agreement

that is the subject of ProfiTel's breach of contract claim.   At issue in PolyOne's

counterclaim is Section 4.2 of the Consulting Agreement, which states:

> [PolyOne] shall supply to [ProfiTel] all information reasonably requested
> by [ProfiTel] for the purpose of performing the services contemplated
> herein.   For an abundance of clarity, [PolyOne] has entered into this
> agreement to relieve itself of the burden of auditing its communication
> services providers, and to otherwise deploy its internal human resources.
> *[ProfiTel] shall not utilize [PolyOne's] personnel to perform auditing*
> *or analysis activities hereunder, and shall provide all personnel and*
> *resources necessary to accomplish the auditing and analysis to the*
> *standard of commercial reasonableness.*

(Def.'s Statement of Material Facts, Ex. A) (emphasis added).   PolyOne asserts that,

in breach of the agreement, ProfiTel used PolyOne personnel to assist in the

performance of auditing and analysis activities and that ProfiTel performed the audit

at a standard falling below that of commercial reasonableness.   PolyOne contends that

these breaches resulted in lost opportunity costs, or lost savings, in the amount of

$638,638.00.   PolyOne moves for summary judgment as to liability, arguing that

ProfiTel was negligent per se, and thus breached the standard of commercial

reasonableness provision, by engaging in the unauthorized practice of law.   ProfiTel

argues, however, that the claim fails in its entirety as a matter of law because the consequential damages alleged by PolyOne are speculative and not the result of any alleged breach.

Under Ohio law,[7] damages can be awarded in a breach of contract case for "the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract." Gomez v. Huntington Trust Co., 129 F. Supp. 2d 1116, 1128-29 (N.D. Ohio 2000) (quoting Toledo Group, Inc. v. Benton Indus., Inc., 623 N.E.2d 205, 211 (Ohio Ct. App. 1993)). "[G]enerally courts have required greater certainty in the proof of damages for breach of contract than for a tort." Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996); Kinetico, Inc. v. Independent Ohio Nail Co., 482 N.E.2d 1345, 1350 (Ohio Ct. App. 1984). As such, damages must be established with a reasonable degree of certainty and speculative damages are not recoverable. Id. Additionally, the plaintiff has the

---

[7]As noted above, the Consulting Agreement contains a choice of law provision which provides that the contract is to be governed by Ohio law. ProfiTel asserts that it is unclear whether Georgia or Ohio law governs the burden associated with proving damages. However, ProfiTel cites to no case which states that a choice of law provision, while establishing the law applicable to contract construction, does not likewise control the analysis of damages arising out of a breach of that contract. Absent any such precedent, the Court will apply Ohio law to all aspects of claims arising out of the Consulting Agreement.

burden of proving that any claimed damages were actually caused by the alleged breach.  Textron Fin. Corp., 684 N.E.2d at 1266.

Here, PolyOne asserts that ProfiTel wrongfully utilized PolyOne's employees and improperly requested information from non-information technology employees. PolyOne alleges that as a consequence, Richard Bradner, PolyOne's Enterprise Network Manager, had to spend an unnecessary amount of time addressing issues and problems associated with the ProfiTel project.  According to PolyOne, because his time and attention were diverted, Bradner was delayed, albeit not precluded, in implementing certain other cost saving initiatives.  In support of PolyOne's claim, Bradner created a chart reflecting, and testified to, the following information regarding the initiatives that were allegedly delayed: (1) the project start date; (2) the dates on which they were ultimately implemented; (3) the number of days the deployment of the initiative was delayed; and (4) the amount of cost savings associated with each initiative.  (Bradner Dep., Exs. 23 & 65.)  For each initiative with a fixed, ongoing savings rate, Bradner calculated the alleged lost savings by first estimating the amount of time the implementation of the initiative was delayed and then multiplying the number of days by the rate of savings associated with each initiative.  (Bradner Dep. at 18-20, 334-36, 340-42.)  According to PolyOne, the sum of the lost savings

associated with not having each initiative in place sooner constitutes the total measure of damages caused by ProfiTel's alleged breaches.

Although Bradner testified that the implementation delays resulted from his diverted attention, the Court finds his testimony too speculative to establish the existence of damages caused by ProfiTel's alleged breach of contract.  In particular, Bradner testified that he spent approximately 60 days dealing with ProfiTel. However, he offers no specifics and no documentary evidence to support his assertion. Furthermore, his contentions regarding established implementation dates and the number of days that specific cost savings initiatives were delayed due to his time spent on ProfiTel matters are unsupported estimates.  (See, e.g., Bradner Dep. at 344-45, 360, 366, 368, 371, 397-400.)  Such speculation is insufficient to support a claim for breach of contract damages.  See Eaton Corp. v. Taylor-Winfield Corp., No. 62361, 1993 WL 267113, at *5-*6 (Ohio Ct. App. July 15, 1993) (applying lost profits analysis and finding claim for loss of cost savings damages to be too speculative).

As to causation, Bradner indicated that each initiative was delayed for the same reasons: "Time spent dealing with Profitel requests for information, internal issues created by Profitel dealing with non-IT personnel and research dedicated to proving/disproving Profitel Claims of Refund Credit due."  (Bradner Dep., Ex. 65.) However, he could not identify particular information requests that he had to deal with

or research that he had to conduct that caused the specific delays for particular projects.  (See id. at 345-46, 357, 360, 372.)  In fact, Bradner admitted that all of the listed reasons did not apply to each initiative.  (Id. at 346-47.)  Moreover, Bradner conceded that he did not know if other factors could have caused or contributed to the alleged implementation delays.  (See id. at 360.)  A breach of contract action will not survive if the alleged damages are the result of circumstances that were not the responsibility of the allegedly breaching party.  Interim Healthcare of Ne. Ohio, Inc. v. Interim Servs., Inc., 12 F. Supp. 2d 703, 711 (N.D. Ohio 1998).  Therefore, even assuming that ProfiTel breached the Consulting Agreement, absent sufficient evidence to establish damages to a reasonable degree of certainty or that the breaches caused the claimed damages, summary judgment for ProfiTel on PolyOne's counterclaim is appropriate.[8]

## IV.  CONCLUSION

---

[8]PolyOne argues that summary judgment should be denied because it is entitled to at least nominal damages on its breach of contract claim.  The Ohio Supreme Court has made clear, however, that summary judgment is proper in breach of contract cases where the plaintiff fails to provide evidence of damages caused by the breach and seeks to proceed solely on a claim for nominal damages.  DeCastro v. Wellston City Sch. Dist. Bd. of Educ., 761 N.E.2d 612, 617 (Ohio 2002).

For the reasons set forth above, the Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's Breach of Contract Claim [Doc. 78] is DENIED; the Plaintiff's Motion for Summary Judgment as to Defendant's Conditional Counterclaim [Doc. 79] is GRANTED; the Defendant's Motion for Summary Judgment [Doc. 82] is GRANTED; and the Defendant's Motion for Partial Summary Judgment With Respect to Liability as to Defendant's Counterclaim [Doc. 82] is DENIED. The Plaintiff's Motion to Disqualify Defendant's Expert Witness [Doc. 68] is DENIED as moot. The Plaintiff's Motion to Exclude the Late-Produced Damages Summaries and Motion for Sanctions [Doc. 71] is DENIED as moot.  The Defendant's Motion to Exclude Plaintiff's Late-Produced Evidence and Motion to Strike [Doc. 76] are DENIED as moot.

SO ORDERED, this 16 day of June, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge